On behalf of the FOI, Mr. James A. Webb. On behalf of the FAA, Mr. Ryan J. Harriman. Gentlemen, it's come to my attention it's a little chilly in here and I do apologize if it is, but that's the way this building works. So try not to chatter your teeth in the microphone so that we can get a good recording. All right, Mr. Webb, whenever you are ready. Thank you, Your Honor. May it please the Court, Jim Webb for Plaintiff Appellant Southbury Master Homeowners' Association. This case is about the failure of the defendant, Southbury Land Venture, to pay assessments that it owes to the plaintiff's association based on unambiguous terms of the association's declaration. The association was created by the declaration reported by Ocean Atlantic, the original developer of the Southbury subdivision located in Oswego. The declaration, in addition to creating the association, also created an assessment obligation by defining the term assessable lot. The association declaration is interpreted using contract principles according to the case of Forest Point v. Bischoff. And using those contract principles, and I don't mean to stop you there, but the contract has language like contemplated development build-out schedule. Correct. And there's another, I would say, there's another anticipatory word that I can't find immediately, but talking about contemplated and what would happen, but it never happened. Okay. Well, I think that brings up an important distinction that was mentioned in the reply brief. There's, I believe, a distinction between the obligation to pay assessments and the obligation to build. There is nothing in the declaration, the best I can tell, or maybe it is in there because that's not part of this case, that requires a builder to build a set number of residences. Within a certain period of time? Yeah, maybe that's in there, maybe that's not. That's not what this case is about. This case is about a mandate to pay assessments. But you have to pay an assessment on something, and back to the language I was talking about, the contemplated development build-out schedule, Part 3 was going to contain 106 units, and Part 8 was going to contain 189 units. But again, that's confusing the mandate to build from the mandate to pay assessment. It doesn't matter what the chart is called because the definition of an assessable lot specifically refers to the chart. The definition of assessable lot says, for undeveloped property, you look at this chart, which is set forth in Exhibit E, you count the closings that have not taken place, and that's how you determine the number of assessable lots. But that's after some closings had taken place. It doesn't matter. Well, if you look at, you're talking about the closing build-out or something? Correct. Well, that assumes, I mean, if you read that, there have been 10 or whatever that number that are done, and if the others don't get finished, then you're entitled. But there are some already identified and done according to that closing build-out schedule. I don't believe so simply because that's not what the chart says. The trial court didn't even say that. The trial court even said that but for, in the trial court's opinion, a final plat, which I don't believe was required, but for a final plat, the defendant would still owe assessments even if all the property was vacant and even if it owned all the property and there had been no development. That is verbatim out of the trial court's opinion. All right, but you're saying the final plat is not relevant. The final plat is simply not relevant. And why not? It's not relevant because, again, we're focused on the definition of assessable lot. The definition of assessable lot includes a reference to the building chart. It does not include any reference to a final plat. The trial court got there by jumping. How can you have an assessable lot if you don't have a final plat identifying an assessable lot? Because the definition of assessable lot says you can. The definition doesn't say you look at the final plat. The definition says you look at the building chart. And, again, it doesn't matter what the building chart's labeled. It's just at that point it's a math problem. The trial court jumped through six definitions to land on its reliance on final plat. It didn't even have to go that far. All it had to look was at the plain language of the definition of assessable lot, which only referred to the building schedule. And, again, it doesn't matter what you call that. You could have called that building schedule banana ice cream. If the definition says that's what you refer to, that's the chart that you refer to. Now, if in this case the builder is not required to pay anything until the final plat is recorded, who pays his share? Well, that's an incorrect statement. The builder is not required to pay until the dates on the chart start running. So, for instance, for pod 3, I believe there were supposed to be ten closings by the second quarter of 2006. But my question is if we interpret it the same way the trial court did, even if those lots are being built, they're not final plat in that interim time until there's a final plat, who pays his share? Well, I think that assumes that the trial court's interpretation of the declaration was correct, which it was not. Let's assume that it was correct. That's my question. Assuming that it was correct, who would pay this assessment? No one would pay it simply because the trial court said it wasn't due. So it would be divided up amongst those who were already there. Well, I suppose it would be divided up just because the association has certain expenses it has to pay. It has ponds. It has entrance signs. And if you have the owner of 295 assessable lots not paying, then necessarily that burden falls on the other. The 50 that are there. Correct. Correct. Because even though these lots don't have development, there are ponds. There are entrance signs. There is a clubhouse that I'm assuming if you're going to visit to potentially buy a new house, you drive by the clubhouse. That's enticing. So to say that this would be found money for the association is simply not true. So how many ponds? All right, the clubhouse is one thing. How many ponds? Are there roads through these ponds? I believe there's roads. I'm not for certain. I know there are ponds that do adjoin the ponds. And there was testimony at the trial by the board's president that there has been runoff into the ponds that the association simply hasn't had the money to do the maintenance on. But you're not going in and plowing roads and, you know, you're not undertaking pavement repairs and things like that within the ponds. Well, that is being done within the association. So that is all part of the association's budget. But there's nobody there to use them. If there were roads in this area, in pod 3 and pod 8, why would you plow roads where nobody would use them? Well, again, if there were roads, they are used because I'm assuming that eventually the owner will want to sell these units. But there aren't roads, are there? Again, I do not believe there are. Okay. But, again, that also gets to the point of every other builder at the association, if we're simply talking about a matter of fairness of why they should pay for roads that aren't there, every other builder who has owned essentially bare dirt at one time has paid that obligation. Was that in the trial court record? I believe that it was. Did people come in and testify to that, or was that just represented and stipulated? Well, there was testimony that the prior owner of actually pods 3 and 8, First Midwest Bank, who acquired it in foreclosure before they sold it to LandVenture, they were actually sued by the association. In settlement of that case, they paid the assessment obligation and entered into a settlement agreement, which is part of the court record in this trial, basically setting forth that they admitted there were 295 assessable lots, and they paid the assessments on in the settlement of that case. So what's the obligation of the purchaser to undertake that obligation? It's the obligation that it's a covenant according to the definition of assessments. Article 1, section 1, it's the assessment that runs with the land. I guess I'm talking more about, okay, law of the case applies if we make a decision. But if one trial court says, yes, you have to pay and approves the decision, and another trial court says, no, you don't have to pay, they can do that, correct? They can. They need to get here. Again, but I think that just shows that if we're looking at it, it seems to me that your Honor is approaching this from the matter of why should they have to pay assessments from a fairness point of view. Well, ultimately, it's an issue of contract because the declaration is what governs. But even if we look at fairness, the other owners, including the previous owner of this property, have paid their assessments. Okay, but I don't know that it's been raised, but every contract has a possible defense of impossibility. Was that raised in this case? Actually, Judge Pilmer brought that up in the trial. He wanted some case law regarding if any effect of the economic downturn meant anything as far as getting out of the assessment obligation. The case law on that was pretty specific that there is no such defense simply because whenever you enter into a contract, you are offsetting financial risk. Just because something hasn't happened from a financial point of view, if that was a defense, that would be a defense in 99% of all contract cases. There would never be a foreclosure case we go through because 99% of foreclosure cases involve parties who simply don't have the money. So, again, it's ultimately an issue of contract, and the impossibility defense was brought up at the trial, and it does not appear to be relevant at this case. I think the case that was particularly important was the Straub case from Florida, which was cited in the brief. I have copies, if Your Honor, need copies of those. This involved precisely the same situation. Well, not exactly, because in Straub, there were supposed to be, I think with all the different numbers, nine residential lots. Correct. But instead, someone bought this and divided it into four. Correct. So there was an actual activity, a division, a recording, a building. It went way beyond where we are here. So how is it so on point? Because the court ultimately said that was irrelevant. The court determined the declaration says the assessments are based on this formula, which was nine lots. The declaration hadn't been changed. So while the builder could ultimately do whatever he wanted to do with his lots, he still had to pay assessments according to that schedule. But the fact remains he did something with it. He did not. He recorded. He accomplished something. Nothing's been accomplished on POTS 3 and 8. But according to that court, he didn't accomplish anything because the declaration didn't change. The court ruled that if the declaration unambiguously states that assessments are charged according to the number of lots specified in Article 2, which provides that Platte 5 is nine lots, eight of which are owned by the owner. Let's just switch those words. Let's just put our words from the Southbury Declaration into that sentence. It would read, Article 5, Section 4, unambiguously states that assessments are charged according to the building schedule, Exhibit E, which provides that POTS 3 and 8 have 295 assessable lots as of April 2009, all of which are owned by Southbury Land Venture. If the trial court had had that holding in this case, they would be exactly correct, and they would be exactly on point with this trial case. Where would the word contemplated fit? Because that's part of this covenant, contemplated. But the contemplated is simply the label on the list. The definition of assessable lot refers to the list. It doesn't matter what it's labeled. If we were seeking injunctive relief requiring Southbury Land Venture to build a set number of lots, again, I don't know how that turns out under the declaration and under these set of facts. That's not what we're seeking. What we're seeking is the enforcement of the assessment obligation, and that is clearly defined as simply counting the numbers that are in this chart. According to contract law, everything in a contract must have meaning. There are specific numbers. If it wanted to say final plats, it could have. If it wanted to say to be determined, it could have. If it wanted to say between 1 and 500 lots, it could have. But it includes specific numbers, and the definition of assessable lot says that's what you look to. And I think that even makes more sense when you consider each pod was supposed to have its own owner under the declaration. So it included the building chart. Even though it wasn't mandatory, or perhaps even though it might not be mandatory, that still gives the builder some incentive to build according to a set schedule. If there is ever a recorded final plat that goes through negotiation with Kendall County, and Kendall County says, well, I know what you've agreed to with Southbury, but we've got some new rules and regulations about waterfront or marshlands and things of that nature, and you can't have 295 lots. You can only have 200. Do we have a different situation? Well, I think the assessment obligation is still the same. It's based on 295 lots. The association could always amend the declaration, changing it. But why would the association want to do that? Well, I don't think they would. Under her question, if Kendall County comes in and says, you know what, that's all swamp land. That's just got to stay for the ducks or whatever. And they take away 50 lots, 100 lots, you still think they have to pay 295 assessments? Well, then perhaps we are getting into an impossibility argument. But, again, that's not the facts of this case. But isn't that the whole point of the plat? I don't think the point of the plat really matters to this case. All that matters is the definition of assessable lot. And that term, final plat, is nowhere included in that definition. The charge is included in that definition, but the trial court basically substituted final plat for the charge, even though it's not included in that definition. Even though the charge is the term that's specifically included and specifically referenced. Justice Schultz? No, I'm good. Okay. Judge Smith? Yes. 30 more seconds. The trial court erred in this case. They ignored the specific definition of assessable lot that was found in the declaration, included a definition that wasn't there, so violating two maxims of contract law. They put words there that was not there and took out words that were there. There is a mandate to pay assessments based on the chart, which has nothing to do with the mandate to bill. According to the chart, pots 3 and 8 are entitled to or currently consist of 295 assessable lots. They have consisted of that since the second quarter of 2009, according to that chart. Accordingly, the judgment should be reversed so that judgment may be entered in favor of the association for $259,700 in assessments and late fees as to pot 3. $463,050 as to pot 8 for a total of $722,750 plus attorney's fees and costs. Thank you. Thank you. Mr. Harrington. Good morning. Good morning. May it please the court. My name is Ryan Harrington, and I represent the appellee in this matter, the Southbury Land Venture. Our primary contention in this appeal is that the trial court correctly utilized and applied the rules of contractual interpretation when it found that the declaration at issue in this case did not obligate Southbury Land Venture. The appellee to pay assessments on non-existent lots, which could be contained within pots 3 and pot 8 at the Southbury development. Okay. Apparently, the trial court relied on Article 5, Section 4 of the declaration. Only those owners of assessable lots are obligated to pay assessments. And then he then went on to talk about how a lot becomes an assessable lot because there's some issue of title and conveyance. Is that generally what the trial court did? That's correct. By doing, by making the ruling that it did, it utilized the primary rule of contract construction that inquires the interpretation of a contract as a whole. Now, that seems to be what the appellant doesn't want to happen here. The terms assessable lot within Article 5, Section 4 is dependent upon the definition of a lot. Definition of a lot is found in Article 1. There are a number of definitions in Article 1 that apply to the determination of what actually becomes a lot and how a lot then becomes an assessable lot. And by utilizing those rules of contractual interpretation, it correctly found that you can't, in the real world and with this declaration, have a lot in a pot until it's finally platted. How do you address the closing shortfall in Article 5, Section 4? The closing shortfall, as Justice Hutchinson was pointing out, it's a contemplated and proposed schedule. Those are put together back in 2002, 2003, when this entire development was just being contemplated and proposed. And we have a buildup schedule such that if the pods are finally platted, so now we've broken ground, we have streets, we have sewer, we have lighting going through those pods, we're impacting the subdivision. We need to have a schedule of when those lots will be sold. And if they aren't sold, then we have to know how many to charge once the lots are there. And that's an excellent point you're raising here because if we look at the very last sentence of the first paragraph of Section 4, it states that the number of lots equal to the closing shortfall, as it may exist from time to time in a pod, shall be deemed part of the assessable lots. So we can't start counting a closing shortfall unless we have a lot existing within that pod. And that's why the trial court's decision in its order is correct. So in order for there to be a lot, it's your position that that lot has to be filed with the county? Right. We need a final plat. That breaks my pod into lots. And a good example of why there are no lots here was there was testimony. See, Pod 8 is divided into two. There's a main road that runs north and south through the Southberry subdivision, and it goes through Pod 8. And that's why it's divided into Pods 8A and 8B. The appellant doesn't know how many lots are within 8A or 8B because there is no final plat. The shortfall has a number specifically for the entire Pod 8, but they can't determine how many lots are within Pod 8A, for example, because there isn't a final plat. Without a final plat, we can't have a lot. Without a lot, we can't have an assessable lot. And the trial court correctly determined that by looking at the entire declaration. Not just Section 4 of Article 5, but the definitions found in Section 1, the final plat requirements in Article 2, and what the declaration says as far as Exhibit E goes, which is the contemplated and proposed section. Is there a problem in this case because, well, for you, that is, because a preliminary plat, which is strictly that, a preliminary plat is part of these covenants, correct? There is not a preliminary plat for Pods 3 and Pod 8. And, in fact, when the declaration was prepared, there wasn't one for Pod 6, I believe, but that's not part of our case. So there were preliminary plats for a lot of the pods. But not these two? No, Exhibit D actually has the preliminary platting. And, as you can see from that, now, granted, it's in the record C-58 in the appellant's appendix at A-57. That is pretty small to read, but if you look at the, Pod 3 is over on the left-hand side, which only lists acreage. And Pods 8A and 8B, again, only list acreage. If you look, for example, at Pod 1, 2, 4, 5, those have preliminary plats. We can see where the lots are going to be, where the streets are, where the homes are going to exist, where the lots are on those. We don't have that on Pod 3 and 8. It just hasn't happened yet. No, so in the future, if, in fact, we do build or do prepare a final plat where we have 103 homes within Pod 3, well, then I'm standing here with a different story. But that's not where we are today. Well, aren't you standing here with a different story if you get a final plat and you develop 10, and now you are obligated to pay things according to the shortfall, although we're not arguing that here specifically? That made me think of the question you were asking earlier, was that, you know, with the Straub case, if we go in and Kendall County says you can't have 100, you can only have 50, well, then it's going to come back to me to go and try to amend this, saying I can't build those, the city won't let me, so I should only have to pay assessments on 50, which would make sense, because if I only have 50 homes there instead of the anticipated 100, my impact on that subdivision will be half of what it would otherwise be. So they're not going to need the assessments on 100 homes when there's only 50 there. Because that's the point of having the assessments, is so that they can maintain the property in the manner in which the community desires. It's not to have windfall and surplus money. So if they're collecting, I believe they said about $750,000 on empty pods, there's nothing there. This is just grass. There's nothing cut through there. I mean, their position is the pods are part of a bigger subdivision over which they have responsibility, and you'd be paying your share, they're paying their share to fix the clubhouse, unless pods 3 and pods 8 are going to be forbidden from using that in the future. Well, once we have a final plan, people can build their homes on these lots, then those will be part of the assessable lot calculation, and they will be using it. Right now, there's nothing there that's impacting the subdivision. Well, isn't the monies that you would be paying and that the other homeowners are paying, aren't those monies improving the area to make it an appealable subdivision whereby you can sell your lots? So aren't you indirectly benefiting from the maintenance of that subdivision? Not at this point, no. We just have the two empty parcels of land. There's nothing there at all. It's just acreage. No, I appreciate that, but the rest of the lot, I mean, when somebody pulls in, if they see a beautiful waterfall in the front and see the landscaping all done nice, isn't that going to benefit you and assist you in selling your lots? Well, if I had them, I believe that would be so, but we don't have any lots in either one of the pods. Because we have a big piece of property, right? We have a big vacant tract of land. It's your intent to sell them. I suppose at some point that would be what we desire. But that's actually taken care of in the Section 4, because it says the assessments shall be allocated equally against all assessable lots. So that is anticipated, that there will be some pods without lots that aren't paying at this point, because it's only for assessable lots that the assessments are to apply. And what is your definition of an assessable lot? An assessable lot, it's the Article 4, sorry, Section 4 has a definition of an assessable lot, and it's on page A20 of the appendix or C21 of the record. The last sentence of the Section 4 on that page, sorry, each lot shall begin paying quarterly assessments of the annual assessments immediately upon the earlier of 1, conveyance of title to a lot to the first purchaser of a dwelling unit, both of which are defined in Article 1, or to the initial occupancy of a dwelling unit, the first to occur being the initial dwelling closing. Each such lot being deemed an assessable lot. That's what the definition is. So it's clearly dependent upon a lot, which goes back to why Judge Pomer's decision is correct here. He didn't look, you know, in a vacuum strictly at this one paragraph. He looked at the entire declaration in reaching his decision. And that decision is correct because it utilizes what a lot is, and it also utilizes what the declaration requires, a final plat in a number of different locations. And it's also a good real-world application. So this isn't just a declaration, you know, out here. It's being used at this subdivision. And the reason it's drafted as it was was because once a lot's there, then it's impacting. If we don't have lots, there's not the impact that would otherwise occur with the ground broken. So Judge Pomer's decision correctly utilized the rules of contract interpretation. He read this document as a whole, all of it. He didn't try to ignore words like contemplated and proposed in Exhibit E. He used the definitions of everything, read them together, and reached the correct determination in this situation. It has been represented that your predecessor in foreclosure, apparently, agreed that he was, or it was, I don't know, was responsible for these. What happens when you take that position if that representation is accurate? Well, the fact that the bank that foreclosed on this property initially, they were sued. And they entered into a settlement agreement, a settlement agreement, something they chose to do. They are not my agent, so I'm not ratifying anything by buying the property. They made a mistake in paying those assessments. They shouldn't have done that. The suit was filed and settled within three months. And why they chose to do that is something that we can't answer for. I don't know why they did that. They shouldn't have because this declaration doesn't require that they do that. They chose, they made a decision to pay them. And so they were paid up to a certain point in time, and then you came along, or your client came along, and that's where the disagreement starts. Yeah, I don't know what was going on prior to the bank. The bank took it over in foreclosure action, and then when they sold it, they paid those. Okay. But, as again, this isn't like a principal agency situation. The bank and me are completely independent, so I don't know why they chose to do that. I certainly wouldn't have if I was representative at the time. I might be here on a different case with a different caption anyway, but that's not what occurred here. So why they did that is beyond us because they didn't have to. Well, if there are any additional questions, otherwise, on behalf of the appellee, we just pray that you affirm the trial court, Sergeant. We want to thank you for your time this morning. Thank you. All right, thank you. Mr. Webb, if you have a reply, you may proceed. May it please the court, just as an initial matter, I would like to thank Mr. Harrington for bringing up that there is, in fact, a road that goes through Pot 8 to answer the court's question that I could not. As far as the trial court's ruling that you need to have a lot before you have an assessable lot, that is simply not supported by the declaration. I think the trial court might have been confused because the word lot is included in the term assessable lot. If the term had been assessable partition or assessable unit, there might not be the confusion. Just because the name includes the word lot doesn't mean you have to have a lot. Well, if you don't have a lot, you just have this big barren piece of property, maybe with a road through it, maybe not. What are the assessments doing for that barren piece of property? Well, again, there are ponds. There is a road. There is a clubhouse. But, again, ultimately, it's a matter of contract, not a matter of equity. In the contract, the declaration states you look at the chart. You don't look at a final plat. You don't look at whether or not it's a lot. You look at the chart. And the assessable lot, you have to include the full definition. Land Venture only wants assessable lot to mean property that has had a real estate closing, ignoring the rest of the paragraph. The trial court didn't even say that. The trial court said, but for a final plat. The plaintiff wins this case and is entitled to all the money that is owed. Well, we can affirm on any basis found in the record, correct? We don't have to. We're affirming the trial court's decision rather than his or her logic. So if we find something in this record, we can also affirm, correct? Well, that's correct, but the record supports the plaintiff's position. The trial court, again, danced through six different definitions to come up with its own definition of assessable lot. It created a definition when it didn't have to. The definition of assessable lot was right there. Well, in Section 4, it starts on A20 and goes to 21. It says, each lot shall be given paying quarterly assessments of the annual assessments immediately upon an A, B, and C. It doesn't even say assessable lot there. It says each lot. It doesn't say each pot. It says each lot. So are we saying now that the definition of pot should be disregarded? But you have to read on. If you read the rest of the sentence, it talks about the rest of the paragraph. It talks about pots that do not have at least the cumulative number of initial dwelling closings. That pot owner in the language is shall pay assessments, not pay assessments when it records a final plat, not pay assessments once it starts turning over dirt. It says shall be assessed according to the closing shortfall. Yes, but it also says then the owners of the pot excluding those lots where an initial dwelling closing has occurred, which is something that hasn't occurred here, and that triggers the shortfall. Well, no, that just triggers your subtraction. Why would you be subtracting but for the shortfall? Well, no, that just indicates that if there, again, are supposed to be 295 lots and they have closed 10 units, then you subtract 10 from 295 and come up with 285. All that indicates is that the association basically can't double bill. They can't double dip for charge the homeowner for the assessments and charge the pot owner for assessments for the same property. But that's the only place where it talks about the owners of the pot. All the rest are lots. But again, another ground of contract interpretation is the specific governs over the general. Most of this does address situations where property is owned by an individual homeowner as all the developed property out there is right now. However, this provision makes specific reference to the chart for property that has not yet closed. Therefore, the trial court's own definition, created definition of assessable is incorrect. Judgment should be reversed so that the judgment may be entered in favor of the plaintiff for the full amount due, which, again, the trial court was prepared to do but for its created requirement of the final plan. But are you saying that the trial court didn't have to worry about other language in this contract? I mean, that's, I think, what we're talking about. We're relying on a specific section or two, and the trial court looked at the whole document. But if you look at the whole document, I think it still makes sense. The purpose of the document, which is stated in the recitals in the beginning, is to promote orderly development. One of the ways it promotes orderly development is giving some incentive or disincentive to keep up with a building plan. That's what this is about. So you're characterizing this now as a penalty for not performing? Well, I wouldn't say it's a penalty. It's just a provision of the contract that provides incentive to keep building the property. It's not a penalty because it clearly states these are accessible lots. And even reading the contract as a whole, just because the trial court believed it was reading the contract as a whole, did not give the ability under contract interpretation principles to completely ignore the reference to the building chart and the specific definition, which, again, appears to be what it has done. And you believe that by that decision he has disregarded those, even though he did mention those? Well, he mentioned them, but he said you need a final plat to determine the number. To determine the number, all you need is the chart, which is specifically referenced by the definition of accessible lots. A final plat is not specifically referenced. Is there a deadline to build on these? Is there anything setting out a deadline? There is a deadline as far as when the assessment obligation begins. As far as if the association has enforceable rights to make the building happen, I don't know if the declaration supports that. I don't know how that would turn out, but that's not what this case is about. Thank you, gentlemen, for your argument. We'll take the matter under advisement. The decision is in force. We're going to take a short recess to prepare for our next case. Thank you.